No. 126,078

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MAURICE ANTONIO HALL,
*Appellant.*

SYLLABUS BY THE COURT

1.

A party challenging a statute as facially unconstitutional must show that every reasonable reading of the statute would be constitutionally impermissible.

2.

Section 4 of the Kansas Constitution Bill of Rights establishes a right to possess firearms to be applied independently of and not in lockstep with the Second Amendment to the United States Constitution.

3.

Section 4 of the Kansas Constitution Bill of Rights establishes a fundamental right to possess firearms.

4.

Fundamental constitutional rights, including Section 4 of the Kansas Constitution Bill of Rights, are not absolute. They are subject to narrowly tailored limitations advancing compelling governmental interests.

1

5.

A statute impinging on a fundamental right is not presumed to be constitutional. The State must establish the statute is narrowly tailored and advances a compelling governmental interest.

Appeal from Sedgwick District Court; TYLER J. ROUSH, judge. Oral argument held April 10, 2024. Opinion filed February 14, 2025. Affirmed.

*David L. Miller*, of The Law Office of David L. Miller, of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before CLINE, P.J., ATCHESON and PICKERING, JJ.

ATCHESON, J.:  Is a statute criminalizing the possession of firearms by some convicted felons compatible with a person's fundamental "right to keep and bear arms" protected in the Kansas Constitution Bill of Rights section 4? Having examined the legal landscape in 2010 when Kansans voted to amend section 4 to make clear that the constitutional right belongs to individuals rather than to the citizenry collectively, we conclude a limited statutory prohibition may coexist with that right. As with other constitutional rights, section 4 is not absolute and remains subject to narrowly cast limitations advancing compelling governmental interests. Especially given the lethality of firearms, some circumscribed legislative regulation may be justified to promote public safety, including temporary prohibitions on their possession linked to convictions for identified classes of felonies involving violent or otherwise potentially dangerous conduct.

Defendant Maurice Antonio Hall contends his conviction for being a felon in possession of a firearm, itself a felony violation of K.S.A. 2020 Supp. 21-6304(a)(3)(A), cannot stand because the criminal statute impermissibly impairs the constitutional rights secured in section 4. A jury sitting in Sedgwick County District Court in August 2022 convicted Hall of violating K.S.A. 2020 Supp. 21-6304(a)(3)(A) and found him not guilty of first-degree murder. We understand Hall had a handgun, although the type of firearm is not germane to the constitutional issue. The jury heard evidence related to Hall's claim of self-defense, and the district court instructed the jury on the law governing the defense. The incident prompting the charges occurred in October 2020, so Hall's challenge pertains to the constitutionality of K.S.A. 2020 Supp. 21-6304 as it was then.

In a pretrial motion, Hall challenged K.S.A. 2020 Supp. 21-6304(a)(3)(A) and the charge against him on the grounds the statute was a facially unconstitutional violation of section 4. The district court denied the motion. The record on appeal indicates that Hall did not file any posttrial motions in the district court disputing his conviction. The district court ordered Hall to serve a 10-month prison term with postrelease supervision for 12 months and placed him on probation for 18 months, reflecting a presumptive guidelines sentence. Hall has duly appealed.

The Legislature substantively amended K.S.A. 2020 Supp. 21-6304 in 2021, and we do not directly consider those revisions or the constitutionality of the current version of the statute, although many of the changes relax restrictions on felons possessing firearms.

Likewise, in this appeal, Hall has not argued that the Second Amendment to the United States Constitution, preserving "the right of the people to keep and bear arms," negates his conviction or otherwise precludes enforcement of K.S.A. 2020 Supp. 21-

3

6304(a)(3)(A). As we explain, the language of section 4 sets it apart from the Second Amendment and establishes a distinct, if kindred, constitutional right. So we have no reason to examine the intersection of the Second Amendment and the Kansas prohibition on felons possessing firearms or to consider federal caselaw generally construing the Second Amendment. But, as we explain, the United State Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), markedly altering Second Amendment jurisprudence, directly influenced the Legislature's decision to propose the amendment of section 4 and, therefore, does inform our review.

LEGAL ANALYSIS

A. *Summary*

Hall principally contends K.S.A. 2020 Supp. 21-6304(a)(3)(A) is unconstitutional on its face in violation of section 4's protections. In considering the facial challenge, we necessarily construe a constitutional right and then determine if the challenged statute comports with that right. The exercise presents a question of law, and we undertake the task without any special deference to the district court. *State v. Patton*, 315 Kan. 1, 6, 503 P.3d 1022 (2022) ("a statute's constitutionality raises a question of law subject to unlimited review"). Moreover, as Hall has framed this argument, the relevant facts are limited and undisputed. *State v. Mejia*, 58 Kan. App. 2d 229, 231-32, 466 P.3d 1217 (2020) (when material facts are undisputed, issue presents question of law; no deference is given to district court). To prevail, Hall must show that no application of K.S.A. 2020 Supp. 21-6304(a)(3)(A) could survive constitutional review under section 4—a formidable legal task even with a fundamental right. He has failed in the endeavor.

Alternatively, Hall offers a limited argument that the statute has been unconstitutionally applied to him. He raises the as-applied argument for the first time on appeal, and it depends upon a factual premise that lacks support in the appellate record.

4

The insufficiency of the record is itself legally determinative. Hall's point fails because it is factually unsupported.

B. *Hall's Facial Challenge*

1. *Rights protected in Section 4, as amended in 2010*

We first examine the constitutional shield extended to Kansans in section 4. In 2009, the Legislature approved placing an amendment to section 4 on the general election ballot the following year. The voters approved the change—the only revision of section 4 in the State's history. The amendment replaced the opening clause of the amendment that had read, "The people have the right to bear arms for their defense and security;" with this language, "A person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose[.]" The other clause of section 4 remained the same and provides "but standing armies, in time of peace, are dangerous to liberty, and shall not be tolerated, and the military shall be in strict subordination to the civil power."

As a starting place, we recognize that the legislators promoting the amendment of section 4 intended the revision to constitutionally overrule *Salina v. Blaksley*, 72 Kan. 230, 232-33, 83 P. 619 (1905), that had recognized a limited collective right to possess firearms associated only with service in the militia or a comparable governmental military force. Sen. Journal, p. 481 (March 24, 2009); House Journal, p. 436 (March 25, 2009). Based on that narrow construction of the original language in section 4, the *Blaksley* court upheld a municipal ordinance precluding intoxicated persons from carrying firearms within the city limits. The amendment materially altered the scope of section 4 to identify a personal right keyed to self-defense and other lawful conduct—a protection far broader than the one recognized in *Blaksley*.

5

Given the present language of section 4, we may safely conclude it establishes enumerated protections distinct from "the right to keep and bear arms" described in the Second Amendment. In other words, the amended version of section 4 does not create a lockstep right that merely (and automatically) mirrors the current reading the United States Supreme Court has given the Second Amendment and would then change to reflect that Court's future readings.

The Kansas Supreme Court has, however, construed some sections of the Kansas Constitution Bill of Rights worded like parts of the United States Constitution to create parallel protections that shift in scope to match the United States Supreme Court's changing interpretation of the federal right. See *State v. Petersen-Beard*, 304 Kan. 192, 210, 377 P.3d 1127 (2016) (noting court's "general practice of giving an identical interpretation to identical language appearing in both the Kansas Constitution and our federal Constitution"); see, e.g., *State v. Johnson*, 293 Kan. 1, 5, 259 P.3d 719 (2011) (Fourth Amendment and section 15 offer same protections against unreasonable search and seizure); *State v. Wittsell*, 275 Kan. 442, 446, 66 P.3d 831 (2003) (protection against double jeopardy in Section 10 Kansas Constitution Bill of Rights "'equivalent to" that in United States Constitution) (quoting *State v. Mertz*, 258 Kan. 745, 749, 907 P.2d 847 [1995]). So with those sections of the Kansas Constitution Bill of Rights, the enumerated right morphs as the United States Supreme Court reshapes the contours of the comparable federal constitutional right. The state constitutional right then exists in lockstep with the federal constitutional right. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law, 174 (2018) (describing "lockstepping" as "the tendency of some state courts to diminish their constitutions by interpreting them in reflexive imitation of the federal courts' interpretation of the Federal Constitution"); Boldt & Friedman, *Constitutional Incorporation: A Consideration of the Judicial Function in State and Federal Constitutional Interpretation*, 76 Md. L. Rev. 309, 341-43 (2017).

The substantial gulf in wording between section 4 and the Second Amendment cuts strongly against a lockstep interpretation of the Kansas constitutional right. Had the Legislature intended the 2010 amendment of section 4 to establish a right that would shift over time to match whatever some future United States Supreme Court might say the Second Amendment protects, it would have incorporated the language of the Second Amendment into section 4. The Legislature plainly did not. And the voters did not approve such a change.

The Second Amendment, in full, declares: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The contrast with section 4 is striking. First, of course, the amended language of section 4 refers to the right of "a person" replacing a more collectively framed right of "the people," which did parallel the Second Amendment. The Kansas right is directedly tied not only to self-defense but to much more expansively stated uses of firearms. The Second Amendment offers no explicit purpose for bearing arms, apart from the recited need for a militia that functioned immediately after the Revolutionary War as a citizen-based alternative to a regular army. Conversely, the other clause of section 4 describes the dangers of standing armies.

As reflected in the 2009 legislative journals, the legislators supporting the amendment of section 4 intended that change to constitutionalize the rights of gun owners the United States Supreme Court recognized in *Heller*. Sen. Journal, p. 481 (March 24, 2009). That is, the amendment would permanently establish in the Kansas Constitution the specific interpretation of the Second Amendment the Court majority rendered in *Heller*, even if a future Court were to reject that view of the federal right. Several senators expressed concern that as a 5-4 decision, *Heller* might be especially vulnerable to revision or rejection with even a limited change in the Court's composition. Sen. Journal, p. 481 (March 24, 2009).[1]

7

[1] Although the Kansas House overwhelmingly approved placing the amendment of section 4 before the voters, the House journal includes only one joint statement of three representatives briefly identifying an intent to reject the *Blaksley* decision's restrictive reading of the constitutional protection in section 4. House Journal, p. 436 (March 25, 2009). All of the other recorded legislative statements on the amendment appear in the Senate journal. Sen. Journal, pp. 480-81 (March 24, 2009) (statement of only senator voting against amendment and three joint statements in favor reflecting declared views of 17 senators).

The *Heller* decision has routinely been described as a landmark ruling—and even revolutionary—in redefining the Second Amendment's protection of gun ownership. *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1322-23 (11th Cir. 2015) (characterizing *Heller* as "landmark" case that "revolutionized Second Amendment jurisprudence"); *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015) (landmark decision); *United States v. Seay*, 620 F.3d 919, 923 (8th Cir. 2010) (landmark decision). The *Heller* majority found the Second Amendment entailed an individual right to possess firearms principally for self-defense and cleaved the right from a collectivist notion of a protection afforded "the people" for the principal purpose of maintaining militias. 554 U.S. at 595 ("Second Amendment conferred an individual right to keep and bear arms"); 554 U.S. at 630 (Second Amendment shields "core lawful purpose of self-defense"); see also *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 226 (4th Cir. 2024); *Seay*, 620 F.3d at 923 (*Heller* established "an individual right unconnected to service in the militia").

The United States Supreme Court had not comprehensively examined the scope of the Second Amendment before *Heller*. See *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir. 1999) (describing "[t]he Supreme Court's jurisprudence" on Second Amendment as "quite limited"); Note, *Under the Gun: Will States' One-Gun-Per-Month Laws Pass Constitutional Muster After* Heller *and* McDonald*?* 38 Seton Hall Legis J. 163, 167-69 (2013) (reviewing Supreme Court's Second Amendment caselaw); Howell, *Come and Take It: The Status of Texas Handgun Legislation After* District of Columbia

v. Heller, 61 Baylor L. Rev. 215, 218-19 (2009). In 1939, the Court upheld the prosecution of two men for transporting a short-barreled shotgun in interstate commerce in violation of federal law because such a weapon could not be considered reasonably related to the maintenance of a well-regulated militia and, therefore, fell outside the protections of the Second Amendment. *United States v. Miller*, 307 U.S. 174, 178, 59 S. Ct. 816, 83 L. Ed. 1206 (1939). In his majority opinion in *Heller*, Justice Scalia characterized *Miller* as a narrow Second Amendment decision resting on the type of weapon and not on the ostensible relationship between the protected right to bear arms and the prefatory clause addressing militias—a discussion in *Miller* he dismisses as cursory, at best. 554 U.S. at 623-24.[2]

[2] In *Blaksley*, the court read the original version of section 4 of the Kansas Constitution Bill of Rights in the same way the United States Supreme Court later construed the Second Amendment in *Miller*. And in support of that reading, the *Blaksley* court suggested the language of the Second Amendment described a comparably limited right resting on the need for militias. *Blaksley*, 72 Kan. at 232. The United States Supreme Court has characterized the *Blaksley* court's view of the Second Amendment as "clearly erroneous." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 68, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).

In an exhaustive dissent in *Heller*, Justice Stevens, joined by three of his colleagues, submitted that despite its lack of detail, *Miller* hewed to the history of the Second Amendment and to a protection of a collective right grounded in mutual defense against a hostile enemy rather than in personal self-defense. 554 U.S. at 636-38, 645-46 (Stevens, J., dissenting). The Kansas legislators supporting the amendment of section 4 feared the efficacy of that dissent with a reconfigured Court majority.

Relevant here, the *Heller* majority pointed out that Second Amendment rights are not absolute and may be subject to reasonable limitations. The Court specifically identified "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and restrictions on carrying guns in "sensitive places," such as schools and

governmental offices. 554 U.S. at 626-27 & n.26. And the Court recognized that certain types of firearms—the short-barreled shotgun at issue in *Miller*, for example—may be restricted or banned. 554 U.S. at 627. The dissenters had no quarrel with the proposition that Second Amendment rights could be constrained, as set out in Justice Breyer's lengthy dissent, joined by the other dissenting justices. 554 U.S. at 682-83 (Breyer, J., dissenting). So the constitutionalization of *Heller* in section 4 embodies a set of rights subject to some restrictions.

In short, the majority opinion in *Heller* provides a template for construing the current language of section 4. That language directly appropriates and describes key interpretive conclusions drawn in *Heller*—most significantly, the possession of firearms is a personal right linked to individual self-defense. So Section 4 ought to be applied compatibly with Justice Scalia's opinion and not with some future (and as yet unrealized) reexamination of Second Amendment rights.

In that limited respect, we disagree with the panel opinion in *State v. McKinney*, 59 Kan. App. 2d 345, 359, 481 P.3d 806 (2021), that section 4 "should be interpreted as coextensive to the Second Amendment." The *McKinney* decision holds section 4 to be a lockstep right dependent upon whatever the United State Supreme Court presently says the Second Amendment means. 59 Kan. App. 2d at 355-56. The panel dismissed the plain differences in wording as inconsequential and suggested lockstep treatment of section 4 would be appropriate simply because it addresses the same general subject as the Second Amendment. For the reasons we have outlined, we find that reasoning to be reductive. We may (and do) stake out a different position. See *State v. Urban*, 291 Kan. 214, 223, 239 P.3d 837 (2010) (one Court of Appeals panel not bound by decisions of other panels).

But the *McKinney* panel correctly understood that in 2021, the *Heller* majority opinion continued to reflect the governing articulation of the substantive rights secured in

the Second Amendment. And *Heller* still does today. The panel properly drew on the principles in *Heller* to construe section 4—not because a lockstep analysis should be used but because section 4 itself constitutionalizes those principles.

Our concurring colleague offers two contradictory ways of reading section 4 without acknowledging the contradiction or the analytical dissonance they create. Ultimately, the concurrence promotes applying section 4 in lockstep with the Second Amendment. Slip op. at 38 (In construing section 4, "one can confidently find that Kansas should remain in lockstep with the federal interpretation of the Second Amendment."). As we have explained, a lockstepped state constitutional right expands and contracts to match the United State Supreme Court's contemporaneous interpretation of the corresponding federal constitutional right. But the concurrence also submits "the 2010 amendment [of section 4] permanently safeguarded the *Heller* decision in Kansas." Slip op. at 36. That's essentially what we have concluded, and the conclusion is antithetical to a lockstep treatment of section 4 because it constitutionalizes a particularized set of rights—those the *Heller* majority found in the Second Amendment— and does so even if some future United States Supreme Court were to abandon *Heller*. The concurrence's approach then disjointedly embraces our treatment of section 4 yet rejects the interpretive tool necessary to that treatment. We have no need to critique the concurrence's substantive constitutional analysis of K.S.A. 2020 Supp. 21-6304(a)(3)(A) using Second Amendment principles; but silence should not be taken as endorsement of the enunciated rationale.

Finally, in wrapping up this portion of our analysis, we impute to the 2009 Legislature a certain constitutional prescience. When the Legislature approved the proposed amendment to section 4, the Second Amendment remained one of the few parts of the Bill of Rights that had not yet been incorporated through the Fourteenth Amendment and, therefore, did not apply to the states. *Heller*, 554 U.S. at 620 & n.23. It thus limited only federal law and federal actors. But incorporation had begun to percolate

11

in the federal courts. And the *Heller* majority implied the time might be at hand to reconsider 19th century precedent rendering the Second Amendment a brake on only the federal government. 554 U.S. at 620 n.23 (suggesting the legal foundation for *United States v. Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 [1876]; *Presser v. Illinois*, 116 U.S. 252, 6 S. Ct. 580, 29 L. Ed. 615 [1886]; and *Miller v. Texas*, 153 U.S. 535, 14 S. Ct. 874, 38 L. Ed. 812 [1894], had substantially eroded given later cases incorporating other parts of Bill of Rights, though recognizing "question [of incorporation] not presented by this case").

Between the legislative approval of the amendment to section 4 in March 2009 and the public vote on it in November 2010, the United States Supreme Court accepted review of a case from the Seventh Circuit Court of Appeals and held that the Second Amendment should be applied to the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010). So the Second Amendment then provided a shield against state laws limiting the possession of firearms. But *Heller*'s interpretation of the Second Amendment remained no stronger than the willingness of at least five justices to adhere to it. In turn, the amendment of section 4 to include the substantive protections recognized in *Heller* afforded Kansans an expansive constitutional right wholly independent of the Second Amendment. See *Hodes & Nauser, P.A. v. Schmidt*, 309 Kan. 610, Syl. ¶ 3, 440 P.3d 461 (2019) (Kansas Constitution may afford greater rights than federal Constitution); *Marcus v. Swanson*, No. 122,400, 2022 WL 3570349, at *4 (Kan. App. 2022) (unpublished opinion), *aff'd* 317 Kan. 752, 539 P.3d 605 (2023).

2. *Analytical framework for assessing statutory limitations on section 4*

As part of the Kansas Constitution Bill of Rights, the protections in section 4 should be presumptively considered fundamental. A hundred and forty years ago, Justice Brewer famously declared that the Kansas Bill of Rights "is something more than a mere

collection of glittering generalities," so each section is "binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions." *Atchison Street Rly. Co. v. Missouri Pac. Rly. Co.*, 31 Kan. 660, Syl. ¶ 1, 3 P. 284 (1884); see *Hodes & Nauser*, 309 Kan. at 633 (quoting *Atchison Street Rly. Co.* in construing fundamental rights in section 1). The court has expressly recognized that various sections of the Kansas Bill of Rights embody fundamental rights. See *Hodes & Nauser v. Kobach*, 318 Kan. 940, Syl. ¶ 3, 551 P.3d 37 (2024) (section 1 includes fundamental right to personal autonomy); *State v. Hirsh*, 310 Kan. 321, 338, 446 P.3d 472 (2019) (section 10 protects criminal defendant's fundamental right against double jeopardy); *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1133, 442 P.3d 509 (2019) (section 5 protects fundamental right to jury trial). We have no reason to conclude section 4 would be an exception to that rule. The Kansas Supreme Court recently assumed section 4 declares a fundamental right in declining to consider a defendant's challenge to K.S.A. 2020 Supp. 21-6304(a) raised for the first time on appeal. *State v. Kemmerly*, 319 Kan. 91, 104, 552 P.3d 1244 (2024). The court's assumption neither assists nor deters us.[3]

[3] We need not decide whether inclusion in the Kansas Constitution Bill of Rights is a sufficient condition to declare a stated right to be fundamental. Section 21, added in 2016, to protect the people's "right to hunt, fish, and trap" using "traditional methods" might test that proposition, especially in the post-frontier society of the 21st century with its supermarkets, online shopping, and dearth of tanneries. Unlike section 4, section 21 had no analog in the original Kansas Constitution Bill of Rights and thus evaded Justice Brewer's consideration in *Atchison Street Rly. Co.*

The Kansas Supreme Court has recognized a specific analytical framework for assessing whether a statute conflicts with a fundamental constitutional right. See *Hodes & Nauser*, 318 Kan. at 950-51; *Hodes & Nauser*, 309 Kan. at 670, 673. The usual presumption of constitutionality does not apply to the statute. *Hodes & Nauser*, 309 Kan. at 673. Rather, the State needs to show the statute advances a compelling governmental interest and does so in a narrowly tailored way. *Hodes & Nauser*, 318 Kan. at 950-51; *Hodes & Nauser*, 309 Kan. at 670. Even a fundamental right is not, therefore, absolute.

13

But a statute impinging on that right must survive strict judicial scrutiny—an especially exacting and demanding standard—and if it does not, the courts must conclude the measure amounts to a constitutionally impermissible impairment.

If we were mistaken in treating section 4 as a fundamental right and in applying strict scrutiny, the error would be harmless. That standard affords Hall the most favorable legal consideration he could receive under any circumstance. And his constitutional claims, nonetheless, fail. He could do no better under a less rigorous standard.

Before engaging in that review of K.S.A. 2020 Supp. 21-6304(a)(3)(A), we consider how statutes impinging on the Second Amendment are analyzed and why that method does not apply here. The United States Supreme Court recently forged a unique constitutional tool for Second Amendment rights that asks whether a governmental restriction on those rights has an anchor in "the historical tradition" of firearms possession and regulation dating from the enactment of the Bill of Rights. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 19, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022); see *United States v. Rahimi*, 602 U.S. 680, 689, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (summarizing rule in *Bruen*). If the challenged limitation has no comparable analog in the nation's history, then it impermissibly burdens Second Amendment rights. 602 U.S. at 692 (test asks whether present restriction sufficiently analogous to historical restrictions, though "not precisely match[ing] its historical precursors"). So *Bruen*'s historical assessment supplants recognized constitutional means-ends tests, including rational basis review and strict scrutiny. *Bruen*, 597 U.S. at 22.

Because the *Bruen* decision governs challenges to statutes, regulations, and other government actions impinging on the Second Amendment right to possess firearms, it has no bearing on the claim before us. We are applying distinct protections embodied in the Kansas Constitution Bill of Rights, and the Kansas Supreme Court has prescribed the analytical process for assessing statutes arguably curtailing those fundamental rights.

14

Moreover, the issue here rests on the amended version of section 4 the Legislature considered in 2009 and the voters approved in 2010. We, therefore, needn't plumb the legal antiquities of the Kansas territory or even the law of the first century and half of Kansas statehood to assess Hall's section 4 challenge to K.S.A. 2020 Supp. 21-6304(a)(3)(A). Dodge City's regulation of firearms in the 1870s and 1880s might add historical color to our discussion, but those measures offer no particularly useful perspective on the modern version of section 4 crafted a decade ago. See Jancer, *Gun Control Is as Old as the Old West*, Smithsonian Magazine (February 2018), smithsonianmag.com/history/gun-control-oldwest-180968013/ (describing firearm regulation in cattle towns of latter 19th century, including Dodge City). We decline a picturesque retrospective as legally beside the point.

### 3. *Facial challenge considered*

As we have said, Hall principally attacks K.S.A. 2020 Supp. 21-6304(a)(3)(A) as a facially unconstitutional restriction of firearm rights protected in section 4. A facial challenge is commonly described as an argument that a statute is unconstitutional in every way it reasonably could be applied. *State v. Ryce*, 303 Kan. 899, Syl. ¶ 4, 368 P.3d 342 (2016); *Hodges v. Johnson*, 288 Kan. 56, 73, 199 P.3d 1251 (2009). But appellate courts may consider a facial attack on a discrete section of a broad statute. See *Rahimi*, 602 U.S. at 693; *Creecy v. Kansas Dept. of Revenue*, 310 Kan. 454, 455, 466, 447 P.3d 959 (2019). We, therefore, consider only subsection (a)(3)(A), consistent with how Hall has framed the issue. His attack on that part of the statute (and, in turn, on his conviction) fails should any of the statutory limitations be constitutionally acceptable—meaning the particular limitation is narrowly tailored to promote a compelling governmental interest.

When Hall was charged and convicted under K.S.A. 2020 Supp. 21-6304(a)(3)(A), it criminalized the possession of a firearm by a person who had within the preceding 10 years been convicted of or completed a prison sentence for a felony under

15

about a dozen designated statutes in the criminal code; a felony drug offense; or attempting, aiding and abetting, or conspiring to commit any of those crimes. That subsection applied only if the person did not possess a firearm when they committed the designated crime. If the person committed various felonies while carrying a firearm, they faced a lifetime ban on possessing a firearm and could be prosecuted under K.S.A. 2020 Supp. 21-6304(a)(1). The constitutionality of K.S.A. 2020 Supp. 21-6304(a)(1) is not before us, and we offer no opinion on that question. Also not relevant here, the statute covered comparable convictions from other jurisdictions and proscribed the possession of defined types of knives.[4]

[4] The full text of K.S.A. 2020 Supp. 21-6304 is included as an appendix at the end of the concurring opinion.

The record indicates Hall had been convicted of possession of marijuana with the intent to distribute, a drug felony supporting the charge and conviction under K.S.A. 2020 Supp. 21-6304(a)(3)(A) in this case. But his facial challenge is not defined by that predicate crime. We should reject the claim if *any* application of the subsection would be constitutionally permissible. As a forensic exercise for this purpose, we consider a conviction for intentional second-degree murder under K.S.A. 21-5403(a)(1), a severity level 1 felony; it is one of the crimes listed in K.S.A. 2020 Supp. 21-6304(a)(3)(A). The crime entails the purposeful, though unplanned, killing of another person without a legally recognized excuse or mitigation, such as self-defense or heat of passion. As a predicate conviction for a charge under K.S.A. 2020 Supp. 21-6304(a)(3)(A), the defendant could not have been in possession of a firearm at the time of the murder and, therefore, must have used another means to kill the victim. Murder stands above other serious crimes in its moral turpitude and irrevocable impact. *Graham v. Florida*, 560 U.S. 48, 69, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). To state an obvious and especially significant fact, an element of the crime requires the death of the victim.

16

In 2020, when Hall violated K.S.A. 2020 Supp. 21-6304(a)(3)(A), a defendant with no relevant criminal history convicted of intentional second-degree murder faced a presumptive sentence of imprisonment for between 147 and 165 months (about 12 to 14 years) followed by postrelease supervision for 36 months. The 10-year prohibition on possessing a firearm under K.S.A. 2020 Supp. 21-6304(a)(3)(A) would begin upon the defendant's completion of the prison portion of the sentence. See *State v. LaGrange*, 294 Kan. 623, 629, 279 P.3d 105 (2012) (construing legally comparable language in predecessor statute and holding 10-year prohibition begins upon defendant's "release from prison"). So the restriction would overlap with the period of postrelease supervision.

Although an objective of punitive incarceration is reformation or rehabilitation, the realization of that goal is unpredictable, perhaps especially with those persons committing particularly violent or morally repugnant crimes. Murder falls in that category. Prohibiting a convicted murderer from possessing firearms for 10 years after their release from prison reflects an appropriate legislative concern for the safety of the general public—a compelling governmental interest and, indeed, a basic purpose of an organized social and political entity. See *State ex rel. Stephan v. Lane*, 228 Kan. 379, 384, 614 P.2d 987 (1980) (describing exercise of police power to secure public safety and welfare); see also Locke, Two Treatises of Government, Bk. II, sec. 7, para. 88 (discussing "legislative and executive power of civil society . . . to judge by standing laws how far offences are to be punished when committed within the commonwealth").

The very nature of firearms justifies the limitation on a person convicted of murder. By design, firearms are lethal weapons capable of inflicting fatal wounds quickly and efficiently at some comparatively safe distance from the targeted individual. Unlike other weapons, they also pose a significant danger to anyone else caught in what may be a sweeping line of fire. Apart from the overlapping right to hunt in section 21, no other portion of the Kansas Constitution Bill of Rights protects the possession of a lethal instrumentality and, in doing so, potentially collides with the State's overarching

17

obligation to ensure public safety, welfare, and tranquility. Governments are instituted for that very purpose, and even fundamental rights may be carefully circumscribed to serve that objective. See U.S. Const. preamble; Declaration of Independence, para. 2. On balance, then, the restriction in K.S.A. 2020 Supp. 21-6304(a)(3)(A) was narrowly tailored to promote a compelling governmental interest when it comes to defendants convicted of second-degree murder. The prohibition is temporary but sufficiently long for the murderer to demonstrate a moral reformation warranting entrusting them with an instrumentality that would permit them to easily replicate their past criminality by quickly inflicting grave harm on numerous victims."

That alone is enough to turn aside Hall's facial challenge to the constitutionality of K.S.A. 2020 Supp. 21-6304(a)(3)(A).

More broadly, the prohibition in K.S.A. 2020 Supp. 21-6304(a)(3)(A) advanced the basic and essential role of government in securing the public's safety and welfare by temporarily restricting access to an especially dangerous instrumentality for a select group of convicted felons. Apart from drug offenders, only persons convicted of homicides and other felonies requiring violence or in-person threats of bodily harm to the victims— such as rape, aggravated battery, and aggravated robbery—suffered a diminution of their section 4 rights. Most of the conduct criminalized as felonies in Kansas did not prompt any limitation under K.S.A. 2020 Supp. 21-6304(a)(3)(A) on a convicted defendant's right to possess firearms.

The temporary prohibition in K.S.A. 2020 Supp. 21-6304(a)(3)(A) did not preclude covered individuals from possessing and using other means of self-defense, such as electronic stun devices, debilitating chemical sprays, and even other weapons. We neither endeavor to catalogue those means nor assess their effectiveness in various circumstances. We also presume firearms in the hands of someone skilled in their use would be more effective in those uncommon situations necessitating lethal force to

18

terminate an imminent threat of great bodily harm or death. See K.S.A. 21-5222(b) (permissible use of deadly force in self-defense). But for that very reason, firearms also become effective and exceptionally dangerous tools in the hands of the criminally disposed in a way other means of self-defense do not.

The concept of narrow tailoring abides no formulaic definition, but as the term suggests, the limitations or restrictions must further the compelling governmental interest without substantially impairing the otherwise protected constitutional right. In legal parlance, the imposition cannot be demonstrably underinclusive—reaching too little conduct to effectively secure the governmental interest—or overinclusive—sweeping in conduct too removed from that interest to be essential for its achievement. *Johnson v. California*, 543 U.S. 499, 515, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546-47, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993); *Hodes & Nauser*, 318 Kan. at 954-55. The fit must be precise, but it need not be perfect. *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 454, 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015). And narrow tailoring depends at least in part on the nature of the fundamental right and the recognized governmental interest. 575 U.S. at 453-54; *Hodes & Nauser v. Stanek*, 318 Kan. 995, 1013-14, 551 P.3d 62 (2024). Here, as we have said, we deal with a temporary restriction precluding a limited group of convicted criminals from possessing an especially dangerous type of weapon.

In the context of free speech and other expression protected in the First Amendment, the Court has equated narrow tailoring to the "least restrictive means" necessary to advance a compelling governmental interest. See *McCullen v. Coakley*, 573 U.S. 464, 478, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2021) (content-based limitation on speech); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000) (speech); *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) (free exercise religion); see also 5 Rotunda & Nowak, Treatise on Const. L. § 20.10 (2024). Even then, the phrase

should not be literally construed in a given circumstance to reflexively permit only what would be wholly inadequate means. See *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004) ("[T]he court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives."); *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989) (Constitution permits least restrictive means "designed to serve those [governmental] interests without unnecessarily interfering with First Amendment freedoms"). A similar concept of minimally necessary restrictions infuses a due process liberty interest of persons involuntarily committed to government custody because of mental infirmity. See *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982).[5]

[5] The concept of least restrictive means of governmental intrusion or limitation on individual rights in service of public policy objectives or interests has been codified in addressing various recurrent situations. See 42 U.S.C. § 2000bb-1(b) (government "may substantially burden" individual's "exercise of religion" only in furtherance of compelling interest and by "least restrictive means"); 20 U.S.C. § 1412(a)(5) (federal grants to states for education of children with disabilities require approved plan to provide services in "least restrictive environment"); K.S.A. 2023 Supp. 59-3075(b)(4) (judicially appointed guardian has statutory duty to "assure that the ward resides in the least restrictive setting appropriate to the needs of the ward"); K.S.A. 2023 Supp. 59-2972(b) (involuntarily committed individual with "intellectual disability" to be placed in institutionally "least restrictive alternative available").

We doubt the least restrictive means test applies here considering the right at stake, the nature of the restriction, and the governmental interest. Those circumstances obviously differ from content-based limitations on constitutionally protected speech or involuntary civil commitment. Moreover, the least restrictive means arguably might be a prohibition of firearms for a single day or a week—a prudentially stunted conclusion that would not tangibly further any governmental interest.

So, even examined systemically, K.S.A. 2020 Supp. 21-6304(a)(3)(A) was narrowly tailored to advance a compelling governmental interest and thus did not run afoul of section 4. The limited prohibition covered a short list of violent or otherwise dangerous crimes and required convicted defendants to demonstrate a law-abiding character and disposition upon their release from prison before they could possess a particularly dangerous type of weapon.[6]

[6] The 2021 amendments to K.S.A. 21-6304 reduced the period of prohibition from ten 10 years to 8 years. That sort of relatively limited reduction does not establish that the 10-year period was constitutionally suspect. The difference between the two is modest and reflects legislative finetuning rather than a dramatic shift in policy or purpose.

Hall attempts to avert the result we reach with an argument that section 4 must be read as a set of absolute rights subject to no limitation, even statutory restrictions narrowly tailored to advance paramount public purposes. Basically, he contends section 4 categorically and without exception protects the right of any "person" to "keep and bear arms," meaning to possess firearms, for self-defense or "any other lawful purpose." On that theory, K.S.A. 2020 Supp. 21-6304(a)(3)(A) was constitutionally infirm because it precluded a carefully circumscribed group of convicted felons from temporarily possessing firearms. The premise—rooted in an absolutist reading of section 4—reflects faulty constitutional jurisprudence.

The protections enumerated throughout the Kansas Constitution Bill of Rights are, for the most part, broadly stated principles designed to shield the citizenry from intrusive, overbearing, and oppressive governmental actions whether embodied in statutes, written policies, or the conduct of individual officials or agents. As such, those principles command paramount consideration. But—contrary to Hall's assertion—they are not categorically impervious to limited qualification consonant with their purpose as part of

21

the social compact between the government and the governed that balances individual liberties with public safety and welfare.

For example, the right to "appear and defend in person" at a criminal trial protected in the Kansas Constitution Bill of Rights section 10 may be constrained in the face of a defendant's conduct aimed at or otherwise disrupting the trial in a way that thwarts the truth-seeking function of the proceedings. See *State v. Cantu*, 318 Kan. 759, 766-67, 547 P.3d 477 (2024) (recognizing district court has authority to remove obstreperous defendant from courtroom after due warning to cease disrupting trial); 318 Kan. at 772 ("a constitutional right may be properly denied, in full or in part, only when a legitimate, overriding interest is present"). Similarly, the section 10 right to a public trial may be curtailed in exceptional circumstances. *State v. Reed*, 302 Kan. 227, 237, 352 P.3d 530 (2015) (recognizing right to public trial "'fundamental'" but "'not inviolate'" and may yield to limited exceptions to ensure fair trial or to prevent disclosure of sensitive information) (quoting *State v. Cox*, 297 Kan. 648, 655, 304 P.3d 327 [2013]). Perhaps even more relevant, the court, in *Hodes & Nauser*, recognized that a fundamental right in section 1 without a direct analog in the United States Constitution could be limited through narrowly tailored legislation advancing an identifiable and compelling governmental interest. 309 Kan. at 614, 674.

The same is true of the rights identified in section 4—they may be constrained in furtherance of an overarching public good. As we have explained, the temporary prohibition in K.S.A. 2020 Supp. 21-6304(a)(3)(A) on some felons possessing firearms is such a limitation. Were Hall's absolutist reading constitutionally correct then neither the Legislature nor the courts could impose any restrictions however slight or reasonable on section 4 rights. In that world, the prohibitions in K.S.A. 21-6301(a)(5) on the possession of short-barreled shotguns and fully automatic firearms would violate section 4. So, too, the prohibition in K.S.A. 21-6301(a)(11) and (j) on students carrying firearms in

22

elementary or secondary schools. Any person could possess any firearm for self-defense in any place. Eight year olds could bring their machine guns to school to ward off bullies.

We decline to credit, let alone endorse, an interpretive theory that would create patently unreasonable and even absurd constitutional doctrine. See *Tennessee Wine and Spirits Retailers Association v. Thomas*, 588 U.S. 504, 518-19, 139 S. Ct. 2449, 204 L. Ed. 2d 801 (2019) (Court declines to impute literalist reading of section 2 of Twenty-first Amendment to United States Constitution that would lead "to absurd results that the provision cannot have been meant to produce"); *Trustees of The United Methodist Church v. Cogswell*, 205 Kan. 847, 860, 473 P.2d 1 (1970) ("A strict construction of tax exemption provisions in the constitution and statutes does not warrant an unreasonable construction of such laws."). Hall's argument for his facial challenge to K.S.A. 2020 Supp. 21-6304(a)(3)(A) is constitutionally untenable.

C. *Hall's As-Applied Challenge*

Hall has alternatively argued that K.S.A. 2020 Supp. 21-6304(a)(3)(A) was unconstitutionally applied to him in defiance of section 4 because he used the firearm in his possession to lawfully defend himself. Unlike a facial challenge, an as-applied claim looks at whether the particular factual circumstances create a constitutional violation. *State v. N.R.*, 314 Kan. 98, 101-02, 495 P.3d 16 (2021); *State v. Hinnenkamp*, 57 Kan. App. 2d 1, 4, 446 P.3d 1103 (2019). As the party asserting the constitutional violation, Hall must establish the necessary predicate facts by a preponderance of the evidence. See *Wilkins v. Gaddy*, 559 U.S. 34, 40, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010) (to prevail on Eighth Amendment claim for cruel and unusual punishment, inmate must prove facts showing guards actually assaulted him and did so maliciously and sadistically); *State v. Yurk*, 203 Kan. 629, 634, 456 P.2d 11 (1969); *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) (claimed First Amendment violation). To go forward with his as-applied claim, Hall must show that he more probably than not acted in self-defense, thereby

23

bringing his conduct within the scope of section 4. Only then would a court need to consider whether K.S.A. 2020 Supp. 21-6304(a)(3)(A) impermissibly impinged on a right protected in section 4. As we explain, Hall's reliance on the jury verdict alone does not satisfy that burden.

Hall neither asserted an as-applied constitutional challenge to K.S.A. 2020 Supp. 21-6304(a)(3)(A) in his written motion to the district court nor otherwise outlined one in arguing the motion. Appellate courts typically decline to consider an issue a party has not presented to the district court. But there are a few recognized exceptions. An appellate court has the discretion to act if the new issue: (1) presents a question of law arising from proved or admitted facts that would be outcome determinative; (2) furthers "the ends of justice" or advances a "fundamental right"; or (3) provides a substitute for a district court's erroneous reason for reaching an otherwise correct result. *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022).

Hall suggests the district court denied an as-applied challenge because in its bench ruling it said there was no reason "to declare the statute unconstitutional, either as a whole, or as applied in this case." But Hall had made no as-applied argument to be denied. Immediately after the district court ruled, Hall's lawyer commented that the underlying conviction supporting the felon-in-possession charge was for "possession of narcotics." But the lawyer did not elaborate on that remark and did not otherwise mention, let alone discuss, Hall's underlying conviction in the motion or during his argument. That's the legal equivalent of no argument at all. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (inadequate briefing amounts to abandonment of appellate argument); *State v. Llamas*, 298 Kan. 246, 264, 311 P.3d 399 (2013) (same). Moreover, even if Hall made an as-applied challenge to the district court based on his predicate conviction (and he didn't), that would be legally different from the self-defense argument he offers on appeal and would be insufficient to preserve his new argument. *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008); *State v. Collins*, No. 125,761,

24

2024 WL 2872044, at *3 (Kan. App. 2024) (unpublished opinion); *State v. Turner*, No. 105,433, 2012 WL 1352831, at *2 (Kan. App. 2012) (unpublished opinion).

On appeal, Hall says we may consider his as-applied challenge under the first exception and argues his possession of a firearm was constitutionally protected because he acted in self-defense. In turn, Hall relies on the jury's verdict finding him not guilty of murder to establish the factual foundation for the argument. But his contention falters on both preservation and substantive deficiencies.

First, Hall would have us infer from a general verdict of not guilty that the jury came to that conclusion based on the trial evidence bearing on self-defense. A general verdict—unlike a jury's answers to special interrogatories—is by its very nature inscrutable. In a given case, an appellate court might infer the jury relied on particular evidence supporting an articulated defense in rendering a not guilty verdict. Here, we can't take even that initial step because the appellate record does not include a trial transcript or the exhibits admitted for the jury's consideration. And it's hardly apparent what legal value might attach to the inference. A jury should acquit a defendant if evidence on an affirmative defense, such as self-defense, does no more than creates a reasonable doubt as to guilt. In other words, the State must disprove an affirmative defense beyond a reasonable doubt to convict. K.S.A. 21-5108(c); *State v. Buck-Schrag*, 312 Kan. 540, 553, 477 P.3d 1013 (2020). The State would fail in that mission even if the jurors simply concluded from the evidence that Hall might have acted in self-defense. That's well short of proving the defense to be more probably true than not. The jury verdict in Hall's trial, then, does not factually establish by a preponderance of the evidence that he acted in self-defense. His as-applied challenge fails on that basis alone.

Second, the trial testimony and exhibits factually depicted Hall's actions, including his claimed defense of self. While the jury evaluated that evidence, its conclusion didn't provide the requisite factual foundation for Hall's constitutional argument. We presume

that had Hall filed a posttrial motion asserting his as-applied challenge to K.S.A. 2020 Supp. 21-6304(a)(3)(A), the district court could have made a factual finding on whether a preponderance of the evidence established self-defense as a necessary threshold for deciding the constitutional question. A factual determination that Hall acted in self-defense is a necessary condition for resolving the constitutional challenge in his favor, although it would not be a sufficient condition to do so.

The district court heard the evidence, just as the jury did, and could have received any additional evidence either side properly might have wanted to present on a posttrial motion. We, of course, are in no position to replicate that decision-making and, therefore, cannot say Hall has satisfied the necessary factual condition. We have no way of reviewing the trial testimony and exhibits because they are not in the record on appeal. Even if they were, we almost certainly could not make adequate credibility findings from those evidentiary materials. See *State v. Franco*, 49 Kan. App. 2d 924, 936-37, 319 P.3d 551 (2014) (appellate courts do not make credibility determinations from transcripts of evidentiary hearings because they have no opportunity to observe witnesses as they testify, especially on cross-examination).

Because we are unable to conclude Hall acted in self-defense, we need not—and really cannot—then consider the legal proposition he advances: K.S.A. 2020 Supp. 21-6304(a)(3)(A) was unconstitutionally applied to him because he carried a firearm and used it to defend himself in an otherwise lawful manner. Hall makes no other precisely framed argument that K.S.A. 2020 Supp. 21-6304(a)(3)(A) was impermissibly applied to him based on some characteristic specific to him or the facts of this case. He does submit that his facial attack on the statute also amounts to an as-applied challenge. But switching the label of that argument doesn't change its basic attributes or its legal flaws.

In sum, we find K.S.A. 2020 Supp. 21-6304(a)(3)(A) to have been a narrowly tailored limitation on Kansans' section 4 rights to possess firearms that promoted a

26

compelling governmental interest in public safety tied to the demonstrable rehabilitation and reformation of persons convicted of a small number of felonies the Legislature has designated as especially violent or dangerous. We reject Hall's facial and as-applied challenges and affirm his conviction for violating K.S.A. 2020 Supp. 21-6304(a)(3)(A).

Affirmed.

* * *

PICKERING, J., concurring: I concur that K.S.A. 2020 Supp. 21-6304(a)(3)(A) is facially constitutional under section 4 of the Kansas Constitution Bill of Rights and that Hall's as-applied constitutional challenge fails. That said, I would find that section 4 of the Kansas Constitution Bill of Rights is coextensive with the Second Amendment to the United States Constitution. Thus, I disagree with the majority opinion's Syllabus paragraph 2. Instead, I would reject the defendant's claim that section 4 should be interpreted differently than the Second Amendment.

The grounds for finding the Second Amendment and section 4 are coextensive are three-fold. First, Kansas has historically remained in lockstep with the United States Supreme Court's interpretation of corresponding federal constitutional provisions, "notwithstanding any textual, historical, or jurisprudential differences." *State v. Lawson*, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013). Second, the United States Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), was the impetus behind the Kansas Legislature's 2009 decision to amend section 4 of the Kansas Constitution Bill of Rights. Third, the goal of emulating *Heller*'s recognition of an individual's Second Amendment right to keep and bear arms is borne out by section 4's amended language, guaranteeing a person "the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose." Kan. Const. Bill of Rights, § 4. Accordingly, I

27

would find that we should interpret section 4 as the United States Supreme Court has interpreted the Second Amendment.

By remaining in lockstep with the United States Supreme Court's interpretation of the Second Amendment, we consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. [*Bruen*,] 597 U.S. at 26-31." *United States v. Rahimi*, 602 U.S. 680, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024). While we are not aware of a founding-era Kansas law that specifically disarmed felons, such a statute is not needed. See *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 30, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). Rather, K.S.A. 2020 Supp. 21-6304(a)(3)(A)'s temporary ban of felons—depending on the nature of their conviction—possessing firearms is consistent with the principles that are found in Kansas' history of disarming dangerous or unlawful persons by restricting firearm use by those prone towards violence. Therefore, I would find that this shared principle of disarming dangerous or unlawful persons is consistent with section 4 of the Kansas Constitution Bill of Rights.

*We should hold that section 4 of the Kansas Constitution Bill of Rights is coextensive with the Second Amendment to the United States Constitution.*

*Standard of review*

To evaluate Hall's arguments, we must engage in interpretation of constitutional provisions, which is subject to de novo review. *State v. Rupnick*, 280 Kan. 720, 736, 125 P.3d 541 (2005).

28

*Kansas' judicial history of coextensive analysis of constitutional rights*

Our Kansas courts have continuously adopted the "general practice of giving an identical interpretation to identical language appearing in both the Kansas Constitution and our federal Constitution." *State v. Petersen-Beard*, 304 Kan. 192, 210, 377 P.3d 1127 (2016). "[F]or the past half-century, this court has generally adopted the United States Supreme Court's interpretation of corresponding federal constitutional provisions as the meaning of the Kansas Constitution, notwithstanding any textual, historical, or jurisprudential differences." *State v. Lawson*, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013); see *Murphy v. Nelson*, 260 Kan. 589, 597, 921 P.2d 1225 (1996); *State v. Coutcher*, 198 Kan. 282, 287-89, 424 P.2d 865 (1967) (defendant challenged Habitual Criminal Act under both Kansas Constitution and Eighth Amendment; court relied on United States Supreme Court cases to reject challenge without distinguishing between Constitutions); see also *State v. Blanchette*, 35 Kan. App. 2d 686, 699, 134 P.3d 19 (2006) ("While the Kansas Supreme Court may interpret the Kansas Constitution in a manner different than the United States Constitution has been construed, it has not traditionally done so.").

Infrequently, the Kansas Supreme Court has found an enumerated right within the Kansas Constitution Bill of Rights is independent of the United States Supreme Court's interpretation of a corresponding federal constitutional right. See *State v. Albano*, 313 Kan. 638, 646, 487 P.3d 750 (2021) (analyzing section 5 separately from Sixth Amendment); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, Syl. ¶ 6, 440 P.3d 461 (2019) (finding section 1 "sets forth rights that are broader than and distinct from the rights in the Fourteenth Amendment"); *State v. McDaniel & Owens*, 228 Kan. 172, 184-85, 612 P.2d 1231 (1980) (independently interpreting section 9 of Kansas Constitution Bill of Rights).

Still, overall, our courts have a strong tendency to adopt the United States Supreme Court's interpretation of a federal constitutional provision as the meaning of the

Kansas Constitution. See *State v. Wood*, 190 Kan. 778, 788, 378 P.2d 536 (1963) ("[T]he command of the Fourth Amendment in the Federal Constitution to federal officers is identical to the command of Section 15 of the Kansas Bill of Rights to law enforcement officers in Kansas."). This standard practice is illustrated in *State v. Boysaw*, 309 Kan. 526, 439 P.3d 909 (2019). There, the Kansas Supreme Court mandated that a litigant advocating for a different reading of a Kansas constitutional provision from its federal counterpart must "explain why this court should depart from its long history of coextensive analysis of rights under the two constitutions." 309 Kan. at 538. The defendant must articulate something in "the history of the Kansas Constitution or in our caselaw that would suggest a different analytic framework" should apply to differentiate section 4 from the Second Amendment. 309 Kan. at 536; see also *State v. Zapata-Beltran*, No. 122,414, 2021 WL 4932039, at *4 (Kan. App. 2021) (unpublished opinion) (finding defendant did not "provide any factual, historical, or legal reason why Kansans intended the protections of the Kansas Constitution 'to apply more broadly' to persons convicted of felonies than the United States Constitution does").

Despite this, the majority opinion places no such burden on the defendant and, instead, embraces the defendant's argument that section 4 does not provide coextensive protection to the Second Amendment.

      a. *Even when there are textual differences, generally the Kansas and United States Constitutions are interpreted similarly.*

The majority's conclusion contradicts the general rule that "the Kansas Constitution is interpreted similarly to its federal counterpart even though the language may differ." *State v. McKinney*, 59 Kan. App. 2d 345, 355, 481 P.3d 806 (2021); see, e.g., *Boysaw*, 309 Kan. at 536-38 (despite textual differences, sections 10 and 18 of the Kansas Constitution Bill of Rights do not provide greater protection than the federal Due Process Clause); *State v. Johnson*, 293 Kan. 1, 5, 259 P.3d 719 (2011) (Fourth Amendment to the

United States Constitution and section 15 of the Kansas Constitution Bill of Rights offer same protections against unreasonable search and seizure); *State v. Wittsell*, 275 Kan. 442, 446, 66 P.3d 831 (2003) (protection against double jeopardy in section 10 of Kansas Constitution Bill of Rights '"equivalent to" that found in the Fifth Amendment to United States Constitution).

One such example can be found in the federal and state confrontation clauses. "The Confrontation Clause provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . *to be confronted with the witnesses against him*.' U.S. Const. amend. VI." (Emphasis added.) *State v. Bennington*, 293 Kan. 503, 507, 264 P.3d 440 (2011). Section 10 states: "In all prosecutions, the accused shall be allowed . . . *to meet the witness face to face*." (Emphasis added.) Kan. Const. Bill of Rights, § 10. Despite these textual differences, our courts have construed section 10 of the Kansas Constitution Bill of Rights to be parallel to the Sixth Amendment to the United States Constitution regarding confrontation of witnesses. *Bennington*, 293 Kan. at 507-08; *State v. Busse*, 231 Kan. 108, 110, 642 P.2d 972 (1982).

And in a recent civil case, *Rivera v. Schwab*, 315 Kan. 877, 894, 512 P.3d 168 (2022), the Kansas Supreme Court interpreted our state equal protection provision to be consonant with the corresponding federal provision: "[T]he equal protection guarantees found in section 2 are coextensive with the equal protection guarantees afforded under the Fourteenth Amendment to the United States Constitution." The Equal Protection Clause of the Fourteenth Amendment, section 1 states: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 2 states: "[A]ll free governments are . . . instituted for [the people's] equal protection and benefit." Kan. Const. Bill of Rights, § 2. The *Rivera* court explained:

"Kansas courts shall be guided by United States Supreme Court precedent interpreting and applying the equal protection guarantees of the Fourteenth Amendment of the federal Constitution when we are called upon to interpret and apply the coextensive equal protection guarantees of section 2 of the Kansas Constitution Bill of Rights." *Rivera*, 315 Kan. at 894.

Numerous cases illustrate how coexisting with the federal counterpart modifies our interpretation of the corresponding Kansas constitutional right. *State v. Ryce*, 306 Kan. 682, 396 P.3d 711 (2017), is one such example. In defining what is a search within the meaning of the Fourth Amendment, the *Ryce* court reviewed the then recently issued United States Supreme Court decision in *Birchfield v. North Dakota*, 579 U.S. 438, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016). The *Ryce* court noted how "[t]he *Birchfield* majority distinguished between breath and blood tests." 306 Kan. at 689. Consequently, the *Ryce* court followed *Birchfield*, which had "extended the search-incident-to-lawful-arrest exception to 'warrantless breath tests incident to arrest for drunk driving,'" while also finding warrantless blood tests violated the Fourth Amendment. 306 Kan. at 699-700.

And in *State v. Chisholm*, 250 Kan. 153, 167-68, 825 P.2d 147 (1992), the Kansas Supreme Court held the district court did not violate the defendant's right to confrontation of a witness under the Kansas and United States Constitutions by analyzing the then recent United States Supreme Court opinion, *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). Keeping with the United States Supreme Court, the *Chisholm* court revisited its decision in *State v. Eaton*, 244 Kan. 370, 769 P.2d 1157 (1989), and overruled the portion of the *Eaton* opinion that set forth the standard for use of child-victim witness testimony under K.S.A. 22-3434: "Because the United States Supreme Court decision in *Craig* no longer requires the State's burden to be so great, we abandon the standard set out in *Eaton* for use of testimony by way of closed-circuit television under K.S.A. 22-3434 and adopt the standard set forth in this opinion." *Chisholm*, 250 Kan. at 168.

*An attempt to establish section 4's independence by comparing the texts of the two constitutional provisions falls short.*

The majority opinion relies on the textual differences between the state and federal constitutional provisions to find that section 4's right to possess firearms should "be applied independently of and not in lockstep with the Second Amendment." 65 Kan. App. 2d __, slip op. at 1, Syl. ¶ 2.

As a reminder, the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The relevant part of section 4 presently states: "A person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose." Kan. Const. Bill of Rights, § 4. (Before 2010, section 4 provided in relevant part that "[t]he people have the right to bear arms for their defense and security." Kan. Const. Bill of Rights, § 4 [adopted July 29, 1859].)

In its literal comparison of the two provisions, the majority states: "The Second Amendment offers no explicit purpose for bearing arms, apart from the recited need for a militia that functioned immediately after the Revolutionary War as a citizen-based alternative to a regular army." Slip op. at 7. The *Heller* Court, however, rejected this limited purpose reading of the Second Amendment. The Court explained the prefatory clause of the Second Amendment "announces the purpose for which the right was codified: to prevent elimination of the militia[, t]he prefatory clause does not suggest that preserving the militia was the *only reason* Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." (Emphasis added.) *Heller*, 554 U.S. at 599. As a result, this literal comparison that disregards the Court's own interpretation of the Second Amendment is highly questionable. Any

33

dependence on these textual differences to support interpreting section 4 independently thus falls short.

In sum, remaining parallel to the United States Supreme Court's interpretation of the Constitution has allowed our state constitutional provisions to adapt in a similar manner as their federal counterparts. Likewise, here, by coexisting with the Second Amendment, our state constitutional rights would adapt much like the Second Amendment. See *McDonald v. City of Chicago,* 561 U.S. 742, 750, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (holding Second Amendment applies to states).

b.      *Kansas amended section 4 due to the* Heller *decision.*

Until 2010, there had never been an amendment to the Kansas Constitution regarding Kansans' right to keep and bear arms. Unquestionably, the *Heller* decision was the impetus behind our Legislature moving to amend the Kansas Constitution. As the Kansas Supreme Court stated: "The importance of understanding the intentions of the legislature in proposing the amendment cannot be understated. '"[T]he polestar in the construction of constitutions is the *intention* of the *makers* and *adopters*."'" *State ex rel. Stephan v. Finney*, 254 Kan. 632, 655, 867 P.2d 1034 (1994).

In 2008, the United States Supreme Court issued its watershed decision in *Heller*, which interpreted the Second Amendment and found there was "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. at 595. That right supports the basic right of "individual self-defense." 554 U.S. at 599. The Court held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. In holding that the Second Amendment guarantees an "individual right to possess and carry weapons in case of

34

confrontation," the *Heller* Court reasoned that in the home, "the need for defense of self, family, and property is most acute." 554 U.S. at 592, 628.

The Court did, however, acknowledge that "the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. One such example of "presumptively lawful regulatory measures" was the "prohibitions on the possession of firearms by felons . . . ." 554 U.S. at 626 & n.26. *Heller* clarified this point: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." 554 U.S. at 626.

In light of the historical *Heller* decision, at the 2009 legislative session, the Kansas Legislature sought to amend section 4 of the Kansas Constitution Bill of Rights to ensure the state enumerated right protected an individual's right to keep and bear arms. As one senator noted:

> "For many years, the citizens of Kansas have operated under the assumption that they possess an individual, Constitutional right to gun ownership. And we celebrated the decision last summer of the U.S. Supreme Court in Heller vs. D.C. confirming this individual right is enshrined in our U.S. Constitution." Sen. Journal, p. 481 (Mar. 24, 2009).

Due to the majority opinion's slim margin in *Heller*, one member of the Kansas Legislature expressed concern that any change in the makeup of the Supreme Court could jeopardize the holding in *Heller* and thus risk a Kansan's individual right to keep and bear arms. And in discussing the holding of *City of Salina v. Blaksley*, 72 Kan. 230, 83 P. 619 (1905), another senator noted:

> "The U.S. Supreme Court rejected this erroneous 'collective right' holding on the Second Amendment in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). The Kansas Legislature and the people of Kansas should also reject this erroneous application to the

35

Kansas Bill of Rights by exercising their right to amend the Kansas Constitution." Sen. Journal, p. 481 (Mar. 24, 2009).

Thus, the purpose of the 2010 amendment—as Hall acknowledges—was to ensure that section 4 of the Kansas Constitution Bill of Rights preserved rights consistent with the United States Supreme Court's interpretation of the Second Amendment in *Heller*.

In essence, the 2010 amendment permanently safeguarded the *Heller* decision in Kansas. This was also noted in *Zapata-Beltran*, 2021 WL 4932039, at *4, which found that the defendant provided "no reason why the 2010 amendment to the Kansas Constitution, adopted less than two years after *Heller* held that the Second Amendment conferred an individual right to bear arms, aimed to provide different protections than existing federal law." *Heller*'s instrumental role in the Kansas Legislature amending section 4 supports a finding that this section should remain coextensive with the Second Amendment.

It is therefore disappointing in my reading of the majority opinion not to see the *Heller* decision receive its fair due. The majority decision states that "[t]he amendment materially altered the scope of section 4 to identify a personal right keyed to self-defense and other lawful conduct—a protection far broader than the one recognized in *Blaksley*." Slip op. at 5. Of course, the 2010 amendment gave broader protection than the century-old *Blaksley* decision, but not before the *Heller* decision had effectively overruled *Blaksley* two years earlier by finding "the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. at 595.

In *Bruen*, the United States Supreme Court specifically recognized that the *Heller* decision overruled *Blaksley*. There, the Court referenced *Heller* as it related to *Blaksley*:

"For example, the Kansas Supreme Court upheld a complete ban on public carry enacted by the city of Salina in 1901 based on the rationale that the Second Amendment protects only 'the right to bear arms as a member of the state militia, or some other military organization provided for by law.' *Salina v. Blaksley*, 72 Kan. 230, 232, 83 P. 619 (1905). That was clearly erroneous. See *Heller*, 554 U.S. at 592." *Bruen*, 597 U.S. at 68.

Undoubtedly, *Heller* first overruled *Blaksley*, which is then later expressed in the 2010 amendment.

Indeed, the Court's post-*Heller* rulings support remaining in lockstep with the highest Court's analysis of the Second Amendment. See, e.g., *Bruen*, 597 U.S. at 32. In *McDonald*, 561 U.S. at 786, the Court held the Second Amendment right to keep and bear arms is fully applicable to the States by virtue of the Fourteenth Amendment. See also *Caetano v. Massachusetts*, 577 U.S. 411, 412, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (holding Second Amendment protection of right to bear arms not limited to "'weapons useful in warfare'").

c. *The goal of emulating* Heller*'s recognition of an individual's Second Amendment right to keep and bear arms is borne out by section 4's amended language*.

Finally, the rights guaranteed to Kansans under section 4 are already found in the Second Amendment. Both provisions confer an individual right to keep and bear arms. U.S. Const. amend. II; Kan. Const. Bill of Rights, § 4.

As noted, section 4 as amended reads: "A person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose." Kan. Const. Bill of Rights, § 4. The *Heller* decision established the individual right to keep and bear arms, which supports the basic right of "individual self-defense." 554 U.S. at 599. While the Second Amendment uses

37

the word "people," and section 4 uses the word "person," the Court removed any doubt that "on the basis of both text and history, . . . the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. Since *Heller*, the Court has continually affirmed the individual right to keep and bear arms. For example, *Bruen* states: "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. There, in analyzing *Heller*, the Court found that the basic right to keep and bear arms for self-defense is not confined to the home. *Bruen*, 597 U.S. at 32.

As for section 4's wording—"for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose"—the *McKinney* panel explained that this language "merely enumerates or provides examples of the protections inherently conferred by the Second Amendment." 59 Kan. App. 2d at 356. Section 4's amended language therefore emulates *Heller*'s recognition of an individual's right to keep and bear arms.

To summarize, understanding how instrumental the *Heller* decision was in prompting Kansas to amend section 4 is essential. The 2010 amendment to section 4 secured an individual's right to bear arms by explicitly drawing from this watershed decision, and hence one can confidently find that Kansas should remain in lockstep with the federal interpretation of the Second Amendment. To find otherwise results in Kansas courts applying section 4 without considering the United States Supreme Court's Second Amendment decisions—such as *Bruen*, *Caetano*, and *Rahimi*—and any of the Court's future Second Amendment decisions. See slip op. at 14 (stating the *Bruen* decision "has no bearing on the claim before us").

d. *K.S.A. 2020 Supp. 21-6304(a)(3)(A), which criminalizes possession of a firearm by a convicted felon, does not violate section 4 of the Kansas Constitution Bill of Rights.*

Hall's facial challenge to the constitutionality of K.S.A. 2020 Supp. 21-6304(a)(3)(A) is "'the most difficult challenge to mount successfully, since the challenger must establish that *no set* of circumstances exists under which the [legislative] Act would be valid.'" (Emphasis added.) *State v. Watson*, 273 Kan. 426, 435, 44 P.3d 357 (2002) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 [1987]).

Our standard for constitutional interpretation is well established: The rule for determining the intention of the drafters "'is to abide by the language they have used; and this is especially true of written constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for so doing.'" *Hodes & Nauser*, 309 Kan. at 622-23.

K.S.A. 2020 Supp. 21-6304(a) states, in relevant part:

"(a) Criminal possession of a weapon by a convicted felon is possession of any weapon by a person who:
. . . .
(3) within the preceding 10 years, has been convicted of a:
(A) Felony under K.S.A. 2020 Supp. 21-5402, 21-5403, 21-5404, 21-5405, 21-5408, subsection (b) or (d) of 21-5412, subsection (b) or (d) of 21-5413, subsection (a) of 21-5415, subsection (b) of 21-5420, 21-5503, subsection (b) of 21-5504, subsection (b) of 21-5505, and subsection (b) of 21-5807, and amendments thereto; article 57 of chapter 21 of the Kansas Statutes Annotated, and amendments thereto; K.S.A. 21-3401, 21-3402, 21-3403, 21-3404, 21-3410, 21-3411, 21-3414, 21-3415, 21-3419, 21-3420, 21-3421, 21-3427, 21-3442, 21-3502, 21-3506, 21-3518, 21-3716, 65-4127a, 65-4127b, 65-4159

39

through 65-4165 or 65-7006, prior to their repeal; an attempt, conspiracy or criminal solicitation as defined in K.S.A. 21-3301, 21-3302 or 21-3303, prior to their repeal, or K.S.A. 2020 Supp. 21-5301, 21-5302 or 21-5303, and amendments thereto, of any such felony; or a crime under a law of another jurisdiction which is substantially the same as such felony, has been released from imprisonment for such felony, or was adjudicated as a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of such felony, was not found to have been in possession of a firearm at the time of the commission of the crime, and has not had the conviction of such crime expunged or been pardoned for such crime."

K.S.A. 2020 Supp. 21-6304(b) makes criminal possession of a weapon by a convicted felon a severity level 8 nonperson felony.

*Hall's plain language argument fails.*

Hall contends that the 2010 amendment to section 4 of the Kansas Constitution Bill of Rights added language that prohibits the Legislature from criminalizing the mere possession of a firearm, regardless of past criminal history. Hall asserts that changing "the people" to "a person" and adding the word "keep" were "significant changes." He also argues that the added language—"for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose"—was significant. Hall relies on dictionary definitions of "keep," "person," "people," and "purpose" to argue that section 4 explicitly guarantees the individual the right to possess and retain arms for any lawful purpose, including self-defense, and that nothing in the plain language limits or qualifies that right based on a person's criminal history.

This interpretation departs substantially from the United States Supreme Court's interpretation that the Second Amendment does not disallow laws prohibiting possession of firearms by felons. *Heller*, 554 U.S. at 626; see also *Rahimi*, 602 U.S. at 716 ("American law has long recognized, as a matter of original understanding and original

40

meaning, that constitutional rights generally come with exceptions.") (Kavanaugh, J., concurring).

Hall compares the language of section 4 to other Kansas constitutional provisions that explicitly limit or restrict fundamental rights and to other states' constitutional provisions that explicitly limit or restrict the right to keep and bear arms. Hall then argues that because section 4 does not explicitly limit or restrict firearm possession to nonfelons, the drafters must have intended section 4's rights to be extended to felons. Yet, "[w]hen the current version of section 4 was adopted by Kansas voters in 2010, it was done with the knowledge that it was unlawful in Kansas to possess a firearm if you had been convicted of a felony in the preceding five years. K.S.A. 2010 Supp. 21-6304(a)(2)." *State v. Foster*, 60 Kan. App. 2d 243, 261-62, 493 P.3d 283 (2021) (Arnold-Burger, C.J., concurring). *Foster* involved an almost identical issue, except that Foster's felony resulted in a five-year ban. The concurrence concluded "that the regulation of firearms related to felons provided in K.S.A. 2020 Supp. 21-6304(a)(2) is not prohibited under section 4 of the Kansas Constitution Bill of Rights." *Foster*, 60 Kan. App. 2d at 263 (Arnold-Burger, C.J., concurring).

Furthermore, a ban on felons possessing firearms less than 12 inches in length has been in the Kansas Statutes since at least 1969. See L. 1969, ch. 180, § 21-4204. And a total ban on convicted felons possessing any firearms was enacted in 1994. See L. 1994, ch. 348, § 4. Therefore, the drafters of the 2010 section 4 amendment intended to continue to prohibit possessing a firearm by felons. In advocating a different reading of a Kansas constitutional provision from its federal counterpart, Hall's burden is to "explain why this court should depart from its long history of coextensive analysis of rights under the two constitutions." *Boysaw*, 309 Kan. at 538. Hall has failed to carry this burden.

41

*Effect of* New York State Rifle & Pistol Assoc. v. Bruen

The United States Supreme Court revisited the Second Amendment in *Bruen*. There, law-abiding citizens who applied for unrestricted licenses to carry handguns in public sued the superintendent of the New York State Police and a licensing officer under 42 U.S.C. § 1983, seeking declaratory and injunctive relief, claiming that the denial of their license applications, which failed to satisfy New York's "'proper cause'" standard, violated their Second and Fourteenth Amendment rights. *Bruen*, 597 U.S. at 16. The Court held New York's "'proper cause'" standard, which is shown when an applicant can "'demonstrate a special need for self-protection distinguishable from that of the general community,'" was unconstitutional. 597 U.S. at 70-71.

Significantly, *Bruen* reset the analogical reasoning under the Second Amendment by doing away with the two-step approach that lower courts used post-*Heller* to evaluate the constitutionality of gun laws. *Bruen* explained: "Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test[.]" 597 U.S. at 23.

*Bruen* held: "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. Consequently, when a firearm regulation is challenged under the Second Amendment, the government must affirmatively prove that its firearms regulation "is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. The reasoning "is neither a regulatory straightjacket nor a regulatory blank check." 597 U.S. at 30. The Court explained:

> "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' On the other hand, analogical reasoning requires only that the

42

government identify a well-established and representative historical *analogue*, not a historical *twin*. [Citation omitted.]" 597 U.S. at 30.

Important to this case, before *Bruen*, the United States Supreme Court has stressed that the Second Amendment does not prohibit laws prohibiting the possession of firearms by felons. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. Justice Kavanaugh's concurrence in *Bruen* repeated this: "'Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" 597 U.S. at 81 (Kavanaugh, J., concurring).

While this case was pending and after our court heard oral arguments, the United States Supreme Court decided *Rahimi.* In *Rahimi*, the Court again applied the *Bruen* analysis, holding that the federal temporary ban on possession of firearms by domestic abusers is constitutional. 602 U.S. at 702. The *Rahimi* Court reviewed the *Bruen* analysis and explained: "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692. In considering whether the challenged regulation comports with the principles underlying the Second Amendment, *Rahimi* emphasized: "Why and how the regulation burdens the right are central to this inquiry." 602 U.S. at 692. Of note, the Court reaffirmed the lawfulness of restricting felons from possession of firearms. 602 U.S. at 699.

Notably, Justice Sotomayor's concurrence discusses how the majority opinion "clarifies an important methodological point that bears repeating: Rather than asking whether a present-day gun regulation has a precise historical analogue, courts applying *Bruen* should 'conside[r] whether the challenged regulation is consistent with the

43

*principles* that underpin our regulatory tradition.'" 602 U.S. at 703-04 (Sotomayor, J., concurring, Kagan, J., joining).

Bruen *and* Rahimi *are instructive here*

Being in lockstep with the United States Supreme Court's interpretation of the Second Amendment, the post-*Heller* analysis as outlined in *Bruen* and *Rahimi* should apply. The question is thus whether the challenged regulation, K.S.A. 2020 Supp. 21-6304, is consistent with the principles that underpin Kansas' regulatory tradition.

Before proceeding, I note the majority opinion suggests that this historical review is not "particularly useful perspective on the modern version of section 4" that was drafted in 2009. Slip op. at 15. I disagree. Otherwise, such a limited review would be incomplete. A historical review beginning when the Kansas Constitution was first ratified is essential to our methodological approach.

In the context of analyzing the constitutionality of a felon in possession of a firearm statute—K.S.A. 2020 Supp. 21-6304(a)(3)(A)—we can look at the rights that existed in the years surrounding Kansas' adoption of its Constitution in 1859 and its 1861 statehood and early development. Because evidence of "*the public understanding* of a legal text in the period after its enactment or ratification" is probative of its original meaning, a court should consider how section 4 was understood in the post-founding era. *Heller*, 554 U.S. at 605.

*Bruen*, as noted, does not require a specific level of specificity:  "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 597 U.S. at 30. This is repeated by the *Rahimi* Court: "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" 602 U.S. at 692.

44

While an examination of the historical record establishes that Kansas had no specific prohibition against convicted felons possessing firearms until 1955, Kansas has a long tradition of disarming categories of people who were not law-abiding and were dangerous if they possessed a firearm. This is shown even without a historical "dead ringer" for K.S.A. 2020 Supp. 21-6304(a)(3)(A). See *Bruen*, 597 U.S. at 30. As in *Rahimi*, this shared principle does prove to be sufficient. 602 U.S. at 704 (Sotomayor, J., concurring).

*We begin with a historical review of Kansas' statehood.*

The Kansas Constitution "was adopted by constitutional convention in July 1859, ratified by the electors of the State of Kansas on October 4, 1859, and became law upon the admission of Kansas into statehood in 1861." *Albano*, 313 Kan. at 641. Section 4 of the Kansas Constitution was included within the Constitution's Bill of Rights.

During the period leading up to the ratification of the Kansas Constitution, abolitionists in Kansas supported disarming groups responsible for violence. Senator (and future United States Vice President) Henry Wilson complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). When the government went too far, these opponents of slavery criticized Kansas authorities for disarming "peaceable" free-state settlers. See, e.g., New-York Daily Tribune (Oct. 2, 1856), https://chroniclingamerica.loc.gov/lccn/sn83030213/1856-10-02/ed-1/seq-4/ ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he . . . violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas*, Holmes County Republican (Oct. 30, 1856) (denouncing the disarmament of "[p]eaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

In keeping with *Heller*'s direction to assess the "postratification history" of section 4, see *Bruen* 597 U.S. at 21, in 1867, less than a decade after the Constitution was ratified, the Kansas Legislature enacted the first statutory prohibition against carrying a dangerous weapon.

"Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the Government of the United States, who shall be found within the limits of this State, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor; and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court." L. 1867, ch. 12, § 1.

The prohibition was codified at G.S. 1868, ch. 31, § 282. While there was no specific mention of convicted felons, the statutory tradition of banning possession of firearms to those people believed to be nonlaw abiding due to being under the influence, not engaged in "legitimate business," or who had "borne arms" in the Civil War against the Union, began. See L. 1867, ch. 12, § 1. The same statute appeared in the 1883 General Statutes, prohibiting a person from selling, trading, giving, loaning "or otherwise furnish[ing] any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons, to any minor, or to any person of notoriously unsound mind.'" *Parman v. Lemmon*, 120 Kan. 370, 372, 244 P. 227 (1925) (citing L. 1883, ch. 105).

A year after the Civil War ended, Senator Wilson defended Congress' "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men . . . ." Cong. Globe, 39th Cong., 1st Sess. 915 (1866). Another article referred to the "constitutional right of every peaceable citizen to carry arms for his own defense." *Kansas Legislature: Some Criticisms on Pending Bills*, The Topeka Daily Capital (Feb. 2,

1883). While not using the term "felon," Kansas sought to ban dangerous or unlawful persons from possessing firearms:

> "It is the dangerous man, whether drunk or sober, who should be arrested and punished; and whenever a person presents himself anywhere and by offensive or abusive conduct, or by exhibiting himself as a walking arsenal; or as a 'thug,' or by both such conduct or exhibition, he should be deemed an offender, and arrested and punished." *Kansas Legislature: Some Criticisms on Pending Bills*, The Topeka Daily Capital (Feb. 7, 1883).

> *To curb violence and lawlessness, Kansas cattle towns restricted firearms in town*.

Historically, growing Kansas cattle towns such as Abilene, Ellsworth, and Dodge City restricted carrying firearms in town to curb violence. When arriving in town, the guns were either temporarily turned in (until leaving town), or the guns were left at home. Jancer, *Gun Control Is as Old as the Old West*, Smithsonian Magazine (February 2018), smithsonianmag.com/history/gun-control-oldwest-180968013. For instance, in 1870, the town of Ellsworth enacted Ordinance No. 1, a handwritten county ordinance prohibiting the discharge of any "gun or pistol" within specified limits around the town.

That same year, Abilene started enforcing a ban of possessing firearms in town to ensure peace. At the time, Abilene, the last stop on the Chisholm Trail where the cattle were sold and shipped eastward, was "a rough and rowdy cowtown." https://abilenekansas.org/news/2021/12/08/a-cowtown-winter-wonderland. As noted by one historian: "News of an arriving cattle herd was met with conflicting emotions in old Abilene. It meant money for shopkeepers, saloon owners and brothels. It also meant fear and alarm to the common citizen, who had to deal with the drunken dangerous cowboys." Richard, *Chronology of Life of James Butler (Wild Bill) Hickok*, Kansas Heritage Server, "Old West Kansas" (Adapted from Joseph G. Rosa's book, They Called him Wild Bill, the Life and Adventures of James Butler Hickok, 181-82 [1974]).

When Abilene was first being established, several ordinances were passed to ensure lawfulness. "The particular ordinance which caused the most comment and turmoil [w]as the one forbidding the carrying of firearms within the city limits." Cushman, *Abilene, First of the Kansas Cow Towns*, The Kansas Historical Quarterly, 250 (August 1940). The ordinance, which took effect on May 20, 1870, banned "any person" from carrying "within the limits of the town of Abilene, or commons: a pistol, revolver, gun, musket, dirk, bowie-knife, or other dangerous weapon upon his or their person or persons." See *Abilene Weekly*, May 12, 1870 (ordinance mandating violators "shall be imprisoned in the common gaol of the town not less than twenty-four hours nor more than ten days"). In addition to appearing in the *Abilene Weekly*, the ordinance "was announced on large bulletin boards at all the important roads entering town. These were first looked upon with awe and curiosity, and only gradually was their significance comprehended." Cushman, *Abilene, First of the Kansas Cow Towns*, The Kansas Historical Quarterly, 250. In response: "The cowboys insolently ridiculed the officers and the disregard for law continued. The posters upon which the ordinances were published were shot so full of holes that they became illegible." Cushman, *Abilene, First of the Kansas Cow Towns*, The Kansas Historical Quarterly, 250.

In furtherance of the ordinance, "[e]ach business house had a sign which read, 'You are expected to deposit your guns with the proprietor until you are ready to leave town.'" Cushman, *Abilene, First of the Kansas Cow Towns*, The Kansas Historical Quarterly, 251. The first marshal hired to enforce the firearm ban was killed in the line of duty. Abilene's mayor then hired James Butler "Wild Bill" Hickok as its next marshal. In what was later widely chronicled in print and film, Hickok enforced the ordinance through his "'hip artillery' [which] was always conspicuously worn. His main dependence was on his quick draw and accurate marksmanship." Cushman, *Abilene, First of the Kansas Cow Towns*, The Kansas Historical Quarterly, 252-53.

In November 1875, the famed frontier town of Dodge City became incorporated and was led by a mayor whose "mandate was to enact laws to reduce the violence." Clavin, Dodge City: Wyatt Earp, Bat Masterson, and the Wickedest Town in the American West, 133 (2017). The council's first enactment was restricting carrying of guns in town. Jancer, *Gun Control Is as Old as the Old West*, Smithsonian Magazine (February 2018). That December, the council passed an ordinance:

> "No person shall in the city of Dodge City, carry concealed about his or her person any pistol, bowie knife, slung shot, or other dangerous or deadly weapon except United States[,] State[,] council, township or city officers and any person convicted of a violation of this section shall be fined not less than [ ] three nor more than twenty five dollars." Dodge City Ordinance, Section VII, approved December 24, 1875.

At the time, given Dodge City's boundaries, the "guns could not be worn or carried north of the 'deadline' which was the railroad tracks." Ford County Historical Society, *Dodge City, Kansas History, Queen of the Cowtowns, The Cowboy Capital*, https://fordcountyhistory.org/dodge-city-kansas-history/. To illustrate this point, *Gun Control Is as Old as the Old West*, the Smithsonian article referenced by the majority opinion, slip op. at 15, includes a photo of a sign placed on Dodge City's Front Street that reads: "Carrying of Firearms Strictly Prohibited." (Provided courtesy of the Kansas Historical Society.)

From 1876 to 1879, the renowned lawmen W.B. "Bat" Masterson, sheriff of Ford County; his brother, Edward Masterson, Marshal of Dodge City; Wyatt Earp, assistant city marshal; along with other lawmen, worked to enforce the mandate. As with other Kansas cattle towns, the ordinance was to prevent the lawlessness that came when the cowboys brought in their cattle herds. See *Dodge City Times*, April 13, 1878 (Marshal Edward Masterson was killed while attempting to disarm two "cattle drivers" who were "under the influence of bad whiskey and carrying revolvers."). At the start of the 1879 cattle season, the Dodge City lawmen "were warning one and all to 'Leave off your

concealed weapons, and don't undertake 'to take the town' . . ." Ford County Historical Society, *Wyatt Barry Stapp Earp's Activities in Dodge City, KS* https://fordcountyhistory.org/people/wyatt-earp/wyatt-barry-staap-earps-activities-in-dodge-city-ks/ (from Frederick Young's book Dodge City: Up through a Century In Story and Pictures). As this historical review illustrates, Kansas has a tradition of disarming dangerous or nonlaw-abiding people.

The United States has a similar tradition of disarming categories of people who are not law-abiding, responsible citizens. See *Bruen*, 597 U.S. at 8-9 (using phrase "law-abiding, responsible citizens" and the like more than a dozen times to describe Second Amendment's protections); *Heller*, 554 U.S. at 635 (holding Second Amendment's scope is limited to "law-abiding, responsible citizens"); see also *United States v. Davey*, No. 23-20006-01-DDC, 2024 WL 340763, at *5 (D. Kan. 2024) (recognizing historical tradition of "disarming dangerous people" and upholding constitutionality of 18 U.S.C. § 922[g][3], the federal ban on habitual drug users possessing firearms).

Kansas history and tradition establish that section 4, like the Second Amendment, allows the Legislature to disarm people who are not law-abiding, responsible citizens. Here, K.S.A. 2020 Supp. 21-6304(a)(3)(A) is consistent with the principles that support Kansas' regulatory tradition of temporarily banning dangerous or unlawful persons from possessing firearms. See *Bruen*, 597 U.S. at 26-31; see also *State v. LaGrange*, 294 Kan. 623, 630, 279 P.3d 105 (2012) ("One of the obvious purposes of prohibiting firearm possession by a person who has previously been convicted of a serious felony is to protect the public."). Similar to Kansas' early years as a state, this present regulation temporarily bans those persons who have shown to be dangerous or nonlaw abiding from possessing firearms, e.g., imposing a 10-year ban for those convicted of distributing illegal substances. See *Rahimi*, 602 U.S. at 692 ("Why and how the regulation burdens the right are central to this inquiry."). And the statute fits comfortably within the tradition of disarming people who are not law-abiding, responsible citizens. Thus, under the *Bruen*

50

test as explained in *Rahimi*, 602 U.S. at 692, K.S.A. 2020 Supp. 21-6304(a)(3)(A) does not violate section 4.

To conclude, section 4 should be interpreted in the same manner as its federal counterpart, the Second Amendment. Following the United States Supreme Court's methodological reasoning from *Heller* and its progeny, *Bruen* and *Rahimi*, K.S.A. 2020 Supp. 21-6304(a)(3)(A) is facially constitutional under section 4 of the Kansas Constitution Bill of Rights.

K.S.A. 2020 Supp. 21-6304. Criminal possession of a firearm by a convicted felon.

(a) Criminal possession of a weapon by a convicted felon is possession of any weapon by a person who:

(1) Has been convicted of a person felony or a violation of article 57 of chapter 21 of the Kansas Statutes Annotated, and amendments thereto, K.S.A. 21-36a01 through 21-36a17, prior to their transfer, or any violation of any provision of the uniform controlled substances act prior to July 1, 2009, or a crime under a law of another jurisdiction which is substantially the same as such felony or violation, or was adjudicated a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of a person felony or a violation of article 57 of chapter 21 of the Kansas Statutes Annotated, and amendments thereto, K.S.A. 21-36a01 through 21-36a17, prior to their transfer, or any violation of any provision of the uniform controlled substances act prior to July 1, 2009, and was found to have been in possession of a firearm at the time of the commission of the crime;

(2) within the preceding five years has been convicted of a felony, other than those specified in subsection (a)(3)(A), under the laws of Kansas or a crime under a law of another jurisdiction which is substantially the same as such felony, has been released from imprisonment for a felony or was adjudicated as a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of a felony, and was not found to have been in possession of a firearm at the time of the commission of the crime; or

(3) within the preceding 10 years, has been convicted of a:

(A) Felony under K.S.A. 21-5402, 21-5403, 21-5404, 21-5405, 21-5408, subsection (b) or (d) of 21-5412, subsection (b) or (d) of 21-5413, subsection (a) of 21-5415, subsection (b) of 21-5420, 21-5503, subsection (b) of 21-5504, subsection (b) of 21-5505, and subsection (b) of 21-5807, and amendments thereto; article 57 of chapter 21

of the Kansas Statutes Annotated, and amendments thereto; K.S.A. 21-3401, 21-3402, 21-3403, 21-3404, 21-3410, 21-3411, 21-3414, 21-3415, 21-3419, 21-3420, 21-3421, 21-3427, 21-3442, 21-3502, 21-3506, 21-3518, 21-3716, 65-4127a, 65-4127b, 65-4159 through 65-4165 or 65-7006, prior to their repeal; an attempt, conspiracy or criminal solicitation as defined in K.S.A. 21-3301, 21-3302 or 21-3303, prior to their repeal, or K.S.A. 21-5301, 21-5302 or 21-5303, and amendments thereto, of any such felony; or a crime under a law of another jurisdiction which is substantially the same as such felony, has been released from imprisonment for such felony, or was adjudicated as a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of such felony, was not found to have been in possession of a firearm at the time of the commission of the crime, and has not had the conviction of such crime expunged or been pardoned for such crime. The provisions of subsection (j)(2) of K.S.A. 21-6614, and amendments thereto, shall not apply to an individual who has had a conviction under this paragraph expunged; or

(B) nonperson felony under the laws of Kansas or a crime under the laws of another jurisdiction which is substantially the same as such nonperson felony, has been released from imprisonment for such nonperson felony or was adjudicated as a juvenile offender because of the commission of an act which if done by an adult would constitute the commission of a nonperson felony, and was found to have been in possession of a firearm at the time of the commission of the crime.

(b) Criminal possession of a weapon by a convicted felon is a severity level 8, nonperson felony.

(c) As used in this section:

(1) "Knife" means a dagger, dirk, switchblade, stiletto, straight-edged razor or any other dangerous or deadly cutting instrument of like character; and

(2) "weapon" means a firearm or a knife.